******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## CHARLES ILL *v.* ELLEN MANZO-ILL
### (AC 42735)

Prescott, Alexander and Suarez, Js.

*Syllabus*

The plaintiff, whose marriage to the defendant previously had been dissolved, appealed to this court from the judgments of the trial court finding him in contempt and awarding the defendant attorney's fees. On appeal, the plaintiff claimed, inter alia, that the court improperly found him to be in contempt, awarded the defendant attorney's fees, and improperly limited his defense at the contempt hearing and at the attorney's fees hearing. *Held* that the trial court abused its discretion in limiting the plaintiff's defense at the contempt hearing: the defendant was afforded the opportunity to establish her prima facie case over a period of four days, whereas the plaintiff was allowed, as a consequence of the court's scheduling order, only one day to call witnesses on his behalf, his defense was largely limited to the introduction of exhibits, and, given the lengthy postjudgment procedural history of the case related to the court's property distribution orders and the complexity of the issues before the court, affording the plaintiff one day to present his defense resulted in an unfair hearing in deprivation of the plaintiff's due process rights; moreover, the court's scheduling order appeared to be arbitrary and not based on the complexity of the issues before it or on the reasonable needs of the parties to present their case, the court, over repeated objections by the plaintiff's counsel, having limited the plaintiff's case before he had an opportunity to present any evidence, indicating that the cout's scheduling order could not have been based on a determination that some or all of the plaintiff's evidence was not relevant or inadmissible on some other grounds; accordingly, the judgments on both the motion for contempt and the award of attorney's fees were reversed and a new contempt hearing was ordered.

Argued May 13, 2021—officially released February 1, 2022

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the the court, *Shay, J.*, rendered judgment dissolving the marriage and granting certain other relief; thereafter, the court, *Hon. Michael E. Shay*, judge trial referee, granted in part the defendant's motion for contempt, and the plaintiff appealed to this court and the defendant filed a cross appeal; thereafter, the court, *Hon. Michael E. Shay*, judge trial referee, awarded the defendant attorney's fees and costs, and the plaintiff amended his appeal; subsequently, the defendant withdrew her cross appeal. *Reversed*; *further proceedings*.

*Norman A. Roberts II*, with whom, on the brief, was *Anthony L. Cenatiempo*, for the appellant (plaintiff).

*Kenneth J. Bartschi*, with whom were *Brendon P. Levesque, James H. Lee*, and, on the brief, *Maria McKeon*, for the appellee (defendant).

*Opinion*

SUAREZ, J. In this postdissolution matter, the plaintiff, Charles Ill, appeals from the judgment of the trial court finding him in contempt and subsequently awarding interest and attorney's fees to the defendant, Ellen Manzo-Ill. On appeal, the plaintiff claims that the court improperly (1) found him to be in contempt, (2) ordered him to pay the defendant the value of certain shares of a private corporation, (3) awarded the defendant postjudgment interest, (4) awarded the defendant attorney's fees, and (5) by virtue of its scheduling order, limited his defense at the contempt hearing and the attorney's fees hearing. We agree with the plaintiff's fifth claim and reverse the judgments of the court and remand the case for a new contempt hearing.

The following undisputed facts and procedural history are relevant to this appeal. On August 19, 2008, following a trial that took place over the course of five days, the court, *Shay, J.*, dissolved the marriage of the parties and entered orders related to alimony and the division of the parties' marital property. These orders, which were clarified by the court on October 3, 2008, provided in relevant part that "[t]he following investment accounts, whether in sole or joint names shall be divided as follows: Within two . . . weeks from the date of this order, the parties shall divide the stocks, bonds, and cash in the Glenmede CLI account (standing in the sole name of the [plaintiff], less that portion attributed to the inherited IRA in the approximate amount of $72,000); Glenmede CLI/EMI account (joint); Wachovia Securities account ([standing in the sole name of the plaintiff]); Avaya/Sierra Holdings ([plaintiff]/sole); Gabelli CLI/EMI account (joint); Assets Plus Investment account; and Deutsche Bank Alex Brown (joint BEA stock) on a pro-rata basis 60 [percent] to the [defendant] and 40 [percent] to the [plaintiff]. Any fractional shares shall be sold and the net proceeds divided in the same proportion." (Emphasis omitted.) The court further ordered that "[t]he parties shall cooperate in the preparation and filing of the 2007 state and federal income tax returns. Any tax due, including interest and penalties for late filing, shall be paid from joint funds, and any refunds shall be divided equally." (Emphasis omitted.)

Neither party was satisfied with the terms of the dissolution judgment. This led to extensive postjudgment litigation. Much of this litigation was detailed in an earlier appeal, *Ill* v. *Manzo-Ill*, 166 Conn. App. 809, 142 A.3d 1176 (2016). For example, on October 23, 2008, the plaintiff filed a direct appeal from the judgment of dissolution, which later was withdrawn on June 8, 2010. Id., 813. On September 19, 2008, the defendant filed a motion to open the judgment of dissolution, which the court denied on April 20, 2010. Id. The defendant filed a motion to reargue the court's denial of her motion to

open the judgment, which the court denied on May 24, 2010. Id. On June 14, 2010, the defendant filed a motion for extension of time to file an appeal from the court's denial of her motion to the open the judgment of dissolution, but she subsequently withdrew the motion on June 24, 2010, and did not bring an appeal from the court's denial of that motion. Id.

On April 6, 2010, while her motion to open the judgment was pending, the defendant filed a motion for modification of alimony on the basis of a substantial change in the parties' circumstances. Id., 813–14. Specifically, the defendant alleged that, "[s]ince the date of the [judgment of dissolution], the circumstances concerning this case have changed substantially in that the plaintiff is currently employed and earning an income, while the defendant is not currently employed, and that a substantial amount of time has elapsed since the judgment was entered and that as a result of the plaintiff's appeal of the judgment, the defendant has been denied access to the funds necessary to support herself." (Internal quotation marks omitted.) Id., 814.

Following a protracted course of litigation with respect to the motion for modification, on May 14, 2014, the trial court, *Heller*, *J.*, granted the plaintiff's second motion to dismiss the motion for modification, noting that "[t]he defendant has failed to show good cause for her delay in prosecuting [the motion] . . . . Under Practice Book § 25-34 [(f)], the defendant's motion for modification is stale, it has not been diligently prosecuted, and it will not be considered by the court." (Internal quotation marks omitted.) Id., 819. Following an appeal by the defendant, this court rejected her claim that the trial court lacked the authority to dismiss the motion for modification. Id., 825. This court also rejected the defendant's claim that the trial court incorrectly determined that she failed to show good cause to avoid dismissal and that she had failed to prosecute her motion with reasonable diligence. Id., 828–30.

Against this backdrop of postdissolution litigation between the parties, we turn to the litigation underlying this appeal. On December 2, 2017, the defendant filed an amended motion for contempt requesting "that the court enter an order finding the plaintiff in contempt for his refusal to transfer assets to the defendant in violation of a court order . . . ." The defendant claimed that "[t]he plaintiff did not pay to the defendant her 60 [percent] share of the Glenmede CLI account (standing in the sole name of the plaintiff, less that portion attributed to the inherited IRA in the approximate amount of $72,000) until July 30, 2015 . . . [t]he plaintiff did not cooperate in the payment to the defendant [of] her 60 [percent] share of the Glenmede joint account and thus prevented distribution to her until July 30, 2015 . . . [t]he plaintiff did not cooperate in the payment to the defendant [of] her 60 [percent] share

of the Deutsche Bank Alex Brown joint account and thus prevented distribution to her until October 20, 2015 . . . [t]he plaintiff did not cooperate in the payment to the defendant [of] her 50 [percent] share of the 2007 federal and state income tax refunds until July 30, 2015 . . . [and] [t]he plaintiff did not cooperate in the sale of the marital home causing the defendant a significant loss of value."

The defendant further claimed that, "[a]s of the date of this motion, the plaintiff has failed and/or refused to transfer to the defendant the following funds/assets . . . [the] defendant's full 60 [percent] of the plaintiff's sole Wachovia accounts . . . [i]ncome generated by the defendant's 60 [percent] of the plaintiff's sole Wachovia accounts from the date of the dissolution through the entry of judgment through the date of partial distribution and the present . . . [i]ncome generated by the defendant's 60 [percent] of the plaintiff's sole Glenmede account . . . from the entry of judgment to July 30, 2015 (the date of distribution to [the] defendant) . . . [i]ncome generated by the defendant's 60 [percent] of the parties joint Glenmede account . . . from the entry of judgment to July 30, 2015 (the date of distribution to [the] defendant) . . . [i]ncome generated by the defendant's 60 [percent] of the parties' joint Gabelli account from the entry of judgment to July 30, 2015 (the date of distribution to [the] defendant) . . . [t]he defendant's 60 [percent] of the Avaya/Sierra Holdings shares . . . [and] [i]ncome generated by the defendant's 60 [percent] of the Avaya/Sierra Holdings shares from the entry of judgment to the present."

The plaintiff argued in his written objection that "the defendant is not credible," and addressed her claims with respect to each account or asset at issue. With regard to the Avaya/Sierra Holdings shares, the plaintiff argued that "the defendant's claim . . . must fail because (1) the defendant is mostly at fault for the failure of the transfer to occur . . . (2) there is no evidence of even a theoretical transaction that could have taken place, and the assertion that there was a transaction available is pure, unsupportable speculation that is contrary to all admitted evidence . . . and (3) there is no evidence of the fair market value of the shares." (Footnotes omitted.) With regard to the Glenmede, Gabelli, and Deutsche Bank accounts, the plaintiff argued that because these accounts "were jointly held by the parties . . . [i]t was always . . . within the defendant's power to effectuate the judgment related to these accounts . . . ." The plaintiff went on to state that "[o]ver [eight] years ago, the plaintiff attempted to get the defendant to sign authorizations to transfer the amounts due from these accounts. He did so on multiple occasions . . . ." With regard to the Wachovia account, the plaintiff argued that he "was precluded by a court order . . . from distributing the Wachovia funds earlier than he did," that "the amount

[he] paid [to the defendant] was in excess of the amount due," and that no interest should be awarded to the defendant because she "was to a great extent responsible for the delay in implementing the orders . . . ." With regard to the sale of the marital home, the plaintiff argued that the defendant "offered no real evidence in support of this claim," and that she failed to make a prima facie case. Finally, the plaintiff argued that "[t]he defendant was unresponsive to seemingly anything involving the implementation of the property orders in the judgment."

The plaintiff then concluded by stating that, "[b]ecause of the defendant's refusal to participate in a meaningful way, the implementation of some of the property orders contained in the judgment was delayed." According to the plaintiff, he "did everything he was supposed to do," and "[t]he defendant's motions seek to retroactively place [him] in an impossible situation—on the one hand, he would have had to circumvent or otherwise compensate for the defendant's lack of participation . . . and implement the judgment on his own; or on the other hand, face claims of contempt and interest." It was the plaintiff's position that the defendant's motion should be denied because he "is not at fault for any delays in implementation of the judgment, but the defendant is."

The court held an evidentiary hearing on the defendant's motion for contempt over five nonconsecutive days beginning on December 14, 2017, and continuing on December 15, 2017, and August 1, 2, and 3, 2018. On March 8, 2019, the court issued a memorandum of decision in which it granted in part the defendant's motion for contempt. In its memorandum of decision, the court found by clear and convincing evidence that the judgment of dissolution clearly "provided for, among other things, the division of marital property including bank accounts, investment accounts, and stock . . . as well as tax refunds and the proceeds from the sale of the marital residence." The court found that the plaintiff failed to comply in a timely manner with the division of the Wachovia, Deutsche Bank, Glenmede, and Gabelli accounts, and that the plaintiff's failure to comply was "[wilful] and without good cause . . . ." The court further found that there was a "clear and unequivocal order of the court that the [tax] refunds be divided 50 [percent] to the [defendant] and 50 [percent] to the [plaintiff]; that the [plaintiff] has failed to comply therewith in a timely manner; that under all the facts and circumstances, the [plaintiff's] failure to comply was [wilful] and without good cause . . . ." The court ordered the plaintiff to pay the defendant $1,620,271, which included $1,088,380 in interest.[1] Additionally, the court ordered that the plaintiff "shall be responsible for his own attorney's fees and costs incurred in connection with this action; and further, on or before March 28, 2019, the [defendant] shall file with

the court, with a copy to counsel, an affidavit of fees in the proper format. Counsel for the [plaintiff] shall have a reasonable opportunity to review same, and to notify opposing counsel and the court of his intention to challenge the reasonableness of the fees and costs claimed, after which the court will schedule a hearing." The plaintiff filed this appeal on March 26, 2019.

On October 24, 2019, the court held a hearing on the reasonableness of the defendant's claimed attorney's fees. The hearing continued on October 29, 2019, and December 18, 2019. On February 19, 2020, the court issued a memorandum of decision in which it concluded that, "having found the [plaintiff] in contempt as to the Wachovia accounts, Deutsche Bank-Alex Brown account,Glenmede accounts, Gabelli account, and the 2007 state and federal income tax refunds, it is equitable and appropriate to award [the defendant] attorney's fees . . . ." The court further concluded that, although it "did not make a finding of contempt as to the [plaintiff's] actions concerning the transfer of the Avaya Stock, it did find him in breach of the court order . . . that it was equitable and appropriate to take into account the [plaintiff's] behavior and the resulting economic loss to the [defendant] . . . [and that] under all the circumstances, including the [plaintiff's] demonstrably dilatory behavior in complying with the court's orders, it would be manifestly unjust to require the [defendant] to pay all of the attorney's fees and costs incurred by her during the protracted litigation, and that it is equitable and appropriate to award her fees . . . ." Thereafter, the court ordered that the plaintiff "shall pay . . . the sum of $1,206,825.10, as and for the legal fees and costs of suit incurred by [the defendant] in connection with this case."

The plaintiff filed an amended appeal from the court's judgment on the motion for contempt and its judgment awarding attorney's fees.[2] Additional facts and procedural history will be set forth as necessary.

We begin our analysis by considering the plaintiff's claim that, by means of its scheduling order, the court improperly limited his defense at the contempt hearing.[3] Our resolution of this claim is dispositive of the appeal. The plaintiff couches the present claim in terms of the trial court having abused its discretion by terminating the hearing before he had a fair opportunity to present his defense. The plaintiff argues that the consequence of the court's abuse of its discretion was that he was deprived of his right to present his defense. We are persuaded that the plaintiff adequately preserved the present claim by means of repeated objections to the court's order by the plaintiff's counsel. We also conclude that the court's discretionary rulings were harmful and that a new contempt hearing is warranted.

Specifically, the plaintiff argues that, "[a]s a result of the trial court's [scheduling] order [that limited the

contempt hearing to five days], [he] was forced to condense his case into less than one day after the [defendant] tried her case over four days. The [defendant] had unfettered discretion to craft her presentation in a manner she saw fit to best support her claims. [He] was not afforded the same opportunity." According to the plaintiff, "[g]iven the heightened evidentiary standards and rigorous due process requirements for indirect civil contempt proceedings . . . the trial court's limitation of the [plaintiff's] case constitutes reversible error." (Citation omitted; internal quotation marks omitted.) The plaintiff also argues that the court (1) "erred in limiting [his] presentation of his defense at the contempt hearing," (2) "erred when it prohibited [him] from cross-examining witnesses and otherwise limited [him] from presenting his case and perfecting the record," and (3) that, "in the aggregate, the . . . court's procedural irregularities and rulings constitute an impermissible departure from the . . . court's proper role as a neutral arbiter of disputes raised by the parties."

We next set forth the applicable standard of review and the relevant legal principles that govern our resolution of this claim. It is well settled that "[m]atters involving judicial economy, docket management [and control of] courtroom proceedings . . . are particularly within the province of a trial court. . . . Connecticut trial judges have inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial." (Citation omitted; internal quotation marks omitted.) *Sowell* v. *DiCara*, 161 Conn. App. 102, 132, 127 A.3d 356, cert. denied, 320 Conn. 909, 128 A.3d 953 (2015). "The [trial] court has wide latitude in docket control and is responsible for the efficient and orderly movement of cases." *Daily* v. *New Britain Machine Co.*, 200 Conn. 562, 574, 512 A.2d 893 (1986). The trial court has "inherent authority to control the proceedings before it to ensure that there [is] no prejudice or inordinate delay." *Gianquitti* v. *Sheppard*, 53 Conn. App. 72, 76, 728 A.2d 1133 (1999). "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *Sowell* v. *DiCara*, supra, 132.

In reviewing the court's exercise of its discretion, we are mindful that "[d]iscretion imports something more than leeway in decision-making. . . . It means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In addition, the court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court." (Citations omitted; internal quotation marks omitted.) *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 16,

776 A.2d 1115 (2001).

In order to put the court's ruling in the present case in necessary context, we note the nature of the contempt matter that was before the court and the burden that shifted to the plaintiff once the defendant proved her prima facie case. Mindful that the plaintiff argues that the court's exercise of discretion resulted in a violation of his due process right to present a defense, we also set forth some basic principles related to the due process rights of the plaintiff to his day in court. "Contempt is a disobedience to the rules and orders of a court which has power to punish for such an offense. . . .

"[C]ivil contempt is committed when a person violates an order of court which requires that person in specific and definite language to do or refrain from doing an act or series of acts. . . . In part because the contempt remedy is *particularly harsh* . . . such punishment should not rest upon implication or conjecture, [and] the language [of the court order] declaring . . . rights should be clear, or imposing burdens [should be] specific and unequivocal, so that the parties may not be misled thereby. . . .

"To constitute contempt, it is not enough that a party has merely violated a court order; the violation must be wilful. . . . The inability of a party to obey an order of the court, without fault on his part, is a good defense to the charge of contempt. . . .

"It is the burden of the party seeking an order of contempt to prove, by clear and convincing evidence, both a clear and unambiguous directive to the alleged contemnor and the alleged contemnor's wilful noncompliance with that directive. . . . If the moving party establishes this twofold prima facie case, the burden of production shifts to the alleged contemnor to provide evidence in support of the defense of an inability to comply with the court order. . . .

"In the absence of an admission of contempt, indirect contempt must be proven by clear and convincing evidence. . . . A judgment of contempt cannot be based on representations of counsel in a motion, but must be supported by evidence produced in court at a proper proceeding. . . .

"[D]ue process of law . . . requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a *chance to testify and call other witnesses* [o]n *his behalf, either by way of defense or explanation.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *Puff* v. *Puff*, 334 Conn. 341, 364–67, 222 A.3d 493 (2020).

"A fundamental premise of due process is that a court cannot adjudicate any matter unless the parties have been given a reasonable opportunity to be heard on the

issues involved . . . . Generally, when the exercise of the court's discretion depends on issues of fact which are disputed, due process requires that a trial-like hearing be held, in which an opportunity is provided to present evidence and to cross-examine adverse witnesses. . . . It is a fundamental tenet of due process of law as guaranteed by the fourteenth amendment to the United States constitution and article first, § 10, of the Connecticut constitution that persons whose . . . rights will be affected by a court's decision are entitled to be heard at a meaningful time and in a meaningful manner. . . . Whe[n] a party is not afforded an opportunity to subject the factual determinations underlying the trial court's decision to the crucible of meaningful adversarial testing, an order cannot be sustained." (Citations omitted; internal quotation marks omitted.) *Szot* v. *Szot*, 41 Conn. App. 238, 241–42, 674 A.2d 1384 (1996). Accordingly, a court does "not have the right to terminate [a] hearing before [the parties have] had a fair opportunity to present evidence on the contested issues." Id., 242.

In the present case, as we will explain in greater detail, the defendant was provided an opportunity to establish her prima facie case over a period of four days. When the burden of production thereafter shifted to the plaintiff to provide evidence of an inability to comply with the court orders that were the subject of the defendant's motion, however, he was allowed, as a consequence of the court's scheduling order, only one day to call witnesses on his behalf, and his defense was largely limited to the introduction of exhibits. Given the lengthy postjudgment procedural history of this case related to the court's property distribution orders, and the complexity of the issues before the court, we conclude that affording the plaintiff only one day to present his defense was an abuse of the court's discretion that resulted in a hearing that was unfair to the plaintiff, depriving him of his due process rights.

The following facts are relevant to our analysis. The hearing on the defendant's motion for contempt originally was scheduled for four days. On the first day of evidence, the plaintiff's counsel, Norman Roberts, expressed his reservations over the time limitations given the lengthy postjudgment history of the case. He repeatedly asserted that he would not have sufficient time to present the plaintiff's defense to the defendant's allegations. As early as the morning of the first day of evidence, Roberts argued to the court that "it does appear we're going to need more dates . . . . I didn't think that we would be halfway through the first day and be where we are." Later during the first day of evidence, Roberts renewed his concern that "[w]e're going to need more time," and again expressed his apprehensions that a hearing lasting only four days was not going to be sufficient. The court responded to Roberts' concerns by saying, "maybe like a stone rolling

down a hill it'll pick up speed . . . . " The court expressed its reluctance to allow additional time because it was concerned that "[t]he work [would expand] to fill the time allotted for its completion." It maintained that, "if we stay focused . . . we'll get this done and I'll get a clear, cogent picture of why the Avaya shares are still not transferred."

At the end of the second day of evidence, Roberts again argued that the plaintiff would not be able to have a meaningful hearing without additional time: "[G]iven that we're two days in and we're still on . . . witness number one, can we get extra dates . . . because we're not going to finish. . . . I mean, there's just no possible way we're going to finish this." The court reassured the parties that they would be afforded "plenty of time . . . ."

Like Roberts, the court also expressed its concerns with the pace of the defendant's case-in-chief. On the second day of evidence, the court admonished the defendant's counsel on her prosecution of the motion. It stated: "[A]nd now we've got a problem. All right. On something that should have taken a very short time, probably thirty minutes on one side, thirty on another, if that, and done. And now we're doing it here, it's 10:30 in the morning, we haven't called our first witness, we're in the middle of a witness." Once again, on the morning of the last scheduled day, the court began by expressing its expectation that the defendant would finish her case-in-chief that day, despite noting that "this is our fourth day," as well as that "[w]e have just a limited number of days assigned." The court conveyed its frustration by noting: "[O]ne of the things that I've experienced in this job for almost nineteen years now, is that often-times one party basically sucks all the oxygen out of the case. And there is no time for the opposing counsel to defend their client . . . . One of the functions that a trial judge has is to take charge of the case, balance the interest of the parties, and get the case done as expeditiously as possible. So we plowed the same row for a while yesterday. And that just can't happen. So, we need to be more economical with our presentations, and focus on what is really important. And then we'll have this case, basically, wrapped up tomorrow." The court further stated: "I just want people to understand that this is a system that is under extreme stress. And I expect counsel to focus on what is important, and what is relevant, and what is going to get us from point A to point B. Particularly the judge—you know—edu-cating me in terms of the facts."

At the conclusion of the fourth day, after the defendant rested her case-in-chief, the court allowed for an additional day in which the plaintiff could present his defense. The court, however, preemptively placed restrictions on the plaintiff's ability to present his case. Specifically, after Roberts stated that he intended to

call four witnesses in presenting the plaintiff's defense, the court responded by saying: "So, I think that—you know—a lean, spare examination, so that we're not plowing that same old furrow again there. You know— just let's—you know—you've got tonight to think about it. You know—sit down with [co-counsel], and just figure out what is important to you." Roberts expressed his frustration with the court's decision to limit the plaintiff's case-in-chief to one day, arguing that "I don't see the possibility of closing evidence tomorrow. I really, really don't." The court admonished the plaintiff's counsel by saying: "This case has gone on way too long. A ten year old case is—you know—it's reached its shelf life, folks. It's expired. All right? So, for everybody's sake—for the system—the least of our worries, but the system, and for these two people whose lives have been on hold all this time, we've got to get some resolution. So, that's the dose of reality . . . . You're a good lawyer. You're—you know—you're a creative lawyer. You need to sit down with all your associates, and figure out how it is that you get your case in, and finish it tomorrow."

Alternatively, in light of the plaintiff's objections to the truncated scheduling order, the court threatened to declare a mistrial. Specifically, the court said: "So, one of the options that I have is—and I—I could—I've probably done it twice in my career, is to [mistry this proceeding], because this is not going to go—I am not carrying this case over to October." Thereafter, in compliance with the court's scheduling order, the plaintiff limited the presentation of his defense by introducing exhibits and limiting the testimony of witnesses to one day.[4]

In his appellate brief, the plaintiff asserts that he was prejudiced by the restrictions that the court placed on him because he "was required to submit numerous documents as exhibits without the benefit of testimony to explain and illuminate the salient portions . . . [and] to limit the number of his witnesses, and limit their testimony." Furthermore, the plaintiff's counsel asserted at oral argument before this court that the plaintiff was prejudiced by the restrictions placed on his defense because he was forced to reformulate his entire presentation in order to attempt to get all of his exhibits admitted into evidence, he was forced to focus on putting documents into evidence to support his trial brief instead of using witnesses to explain or to give context to the evidence for the benefit of the court, and because his ability to call and to examine witnesses was severely circumscribed.

The court's scheduling order does not appear to have been based on the complexity of the issues before the court in ruling on the defendant's motion or the reasonable needs of the parties to present their case. Indeed, the record reflects that, over the repeated objections of the plaintiff's counsel, the court limited the plaintiff's

case-in-chief before he even had an opportunity to present any evidence. Thus, the court's scheduling order could not have been based on a determination that some or all of the plaintiff's evidence was not relevant or that it was inadmissible on some other ground, such as its being cumulative in nature or likely to waste time. See, e.g., Conn. Code Evid. § 4-3. Rather, the court's scheduling order appeared to be arbitrary, and its limitation on the plaintiff's case-in-chief seemingly was the result of the court's frustration that the parties' dispute had been long-standing.

Although the court appears to have been frustrated with the pace of the defendant's presentation of her case, it did not use the tools at its disposal to confine her case-in-chief to relevant matters and to prevent her from presenting what it believed to be cumulative evidence. Instead, in an effort to bring the hearing to a conclusion, it truncated the plaintiff's presentation of his defense. The court's dissatisfaction with the presentation of the defendant's case-in-chief, however, was not a valid basis on which to infringe the plaintiff's right to be heard and to present a defense. The court may limit the time allowed for an evidentiary hearing but its limitation must be reasonable in light of the needs of the parties to present their case. See, e.g., *Dicker* v. *Dicker*, 189 Conn. App. 247, 265, 207 A.3d 525 (2019) ("we previously have determined that the court reasonably may limit the time allowed for an evidentiary hearing" (internal quotation marks omitted)). Nothing in the record suggests that the plaintiff agreed with the court's scheduling order or that he willingly accepted the limitations imposed on him by the court. In fact, the record clearly shows the opposite; as discussed previously, Roberts consistently and repeatedly expressed concern that he would not have enough time to present the plaintiff's case in full. Furthermore, as we discussed previously, the plaintiff specifically has claimed before this court that the trial court's restrictions severely circumscribed his ability to present his defense because they hampered his ability to provide necessary context for other evidence in the case.

We are persuaded that the court effectively terminated the hearing at the end of the fifth day and "before the plaintiff had a fair opportunity to present evidence on the contested issues." *Szot* v. *Szot*, supra, 41 Conn. App. 242. Although the court did allow for the parties to file briefs after the conclusion of the hearing, it is worth noting that the court also expressed its dissatisfaction with lengthy briefs, stating early in the proceedings that "[a] blizzard of paper is not going to be helpful." Moreover, allowing for the filing of a posthearing brief is not a substitute for an effective presentation of evidence, during which the court is able to assess the credibility of witnesses, particularly in a case involving numerous and complex issues that occurred over several years, and when the opposing party was nearly

unfettered in her ability to present her case.

All of these factors, considered together, make clear that the court's scheduling order reflected an abuse of its discretion, the plaintiff was not afforded a fair opportunity to present evidence on the contested issues, and the hearing was fundamentally unfair. Therefore, it is reasonable to conclude, as the plaintiff argues, that he was hampered in his ability to present testimony and to refute the defendant's evidence generally. The record is abundantly clear that the plaintiff's counsel went to great lengths to express his concern to the court that, as a result of its arbitrary decision to limit his presentation of evidence, the plaintiff would not have sufficient time to adequately present his defense and explain to the court why he could not comply with its orders. Under these facts and circumstances, the proper remedy is to reverse the judgments of the trial court and remand the case for a new hearing.

The judgments are reversed and the case is remanded for a new hearing.

In this opinion the other judges concurred.

[1] The court ordered the plaintiff to pay the award as follows: "On or before June 7, 2019, the sum of $850,000, without interest if paid in full in a timely fashion, otherwise said sum shall bear simple interest at the rate of 5 [percent] per annum from the date of this memorandum of decision to and including the date of payment. The balance due in the amount of $770,271 shall be paid by the [plaintiff] in full on or before January 7, 2020, together with simple interest at the rate of 5 [percent] per annum thereon from the date of this memorandum of decision to and including the date of payment in full." (Emphasis omitted.)

[2] The defendant filed a cross appeal from the court's judgment on her contempt motion. The defendant later withdrew the cross appeal.

[3] As we stated previously in this opinion, the plaintiff also claims that the court improperly limited his defense at the attorney's fees hearing. Because we conclude that the court improperly limited the plaintiff's defense at the contempt hearing and that the plaintiff is entitled to a new hearing, the court's award of attorney's fees, which flowed from its finding of contempt, also must be vacated. We need not consider the claim related to the attorney's fees hearing, or the remaining claims in this appeal, as the issues raised therein are not likely to arise during the proceedings on remand. See *Zheng* v. *Xia*, 204 Conn. App. 302, 308 n.10, 253 A.3d 69 (2021) (reviewing court need not reach remaining claims if it is not persuaded that issues raised therein are likely to arise during proceedings on remand).

Although we do not reach the merits of the plaintiff's claim that the court improperly awarded attorney's fees to the defendant, we note that it appears on the face of the court's award that the award of fees does not arise solely from the motion for contempt that is the subject of this appeal; rather, the court stated that its award encompassed "all of the attorney's fees and costs incurred by [the defendant] during this protracted litigation . . . ." Because the trial court may be asked to award attorney's fees during the proceedings on remand, we emphasize that the court has the discretion to award attorney's fees to the prevailing party in a contempt proceeding and that "[a]n abuse of discretion in granting . . . counsel fees will be found only if this court determines that the trial court could not reasonably have concluded as it did." (Internal quotation marks omitted.) *Malpeso* v. *Malpeso*, 165 Conn. App. 151, 184, 138 A.3d 1069 (2016). When contempt is established, "the concomitant award of attorney's fees properly is awarded pursuant to [General Statutes] § 46b-87 and is *restricted to efforts related to the contempt action*." (Emphasis added; internal quotation marks omitted.) Id.

[4] The defendant argues that, because the plaintiff did not "accept" what it mistakenly characterizes as the court's "offer" to declare a mistrial, and proceeded to present his case, the plaintiff should not now be permitted to seek reversal on the ground that the court did not afford him a fair hearing. "[A] party cannot take a path at trial and change tactics on appeal." (Internal

quotation marks omitted.) *State* v. *Martone*, 160 Conn. App. 315, 327, 125 A.3d 590, cert. denied, 320 Conn. 904, 127 A.3d 187 (2015). In light of the repeated objections by the plaintiff's counsel to the court's scheduling order, we are not persuaded that this claim is a departure from any tactical decision made by the plaintiff's counsel at the hearing or that the plaintiff induced the alleged error at issue in this claim.

———————————————